**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Matthew Alan Eagleman, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | **ORDER GRANTING DEFENDANTS'** |
| Steve Larson, Human Relations Counselor; | ) | **MOTION FOR SUMMARY** |
| Bob Coad, Deputy Warden; Steve Heidt, | ) | **JUDGMENT** |
| Case Manager; Timothy Schuetzle, Warden; | ) | |
| in their individual and official capacities; | ) | |
| and Leann Bertsch, DOCR Director, in her | ) | |
| official capacity, and Elaine Little, former | ) | Case No. 1:05-cv-037 |
| DOCR Director, in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' Motion for Summary Judgment filed on January 3, 2005.

The Plaintiff opposes the motion.  For the following reasons the motion is granted.


I.      **BACKGROUND**

The plaintiff, Matthew Eagleman, is an inmate under the custody of the North Dakota

Department of Corrections and Rehabilitation ("DOCR").  The defendants are current and former

employees of the DOCR.

On March 3, 2005, after an initial review of Eagleman's complaint, Magistrate Judge Charles

S. Miller, Jr., recommended that Eagleman be allowed to proceed with the following five claims:

(1) retaliation following the invocation of his Fifth Amendment right against self incrimination, (2)

retaliation for bringing this action and for having filed prior grievances, administrative appeals, and

reports of alleged misconduct; (3) denial of due process in connection with the disciplinary hearing

before the penitentiary's adjustment committee; (4) denial of the right to free exercise of religious

beliefs; and (5) denial of access to the prison law library.  <u>See</u> Docket No. 4.  Eagleman's complaint was filed the same day.  <u>See</u> Docket No. 3.  On March 23, 2006, the Court adopted the recommendation of the Magistrate Judge and directed the Clerk of Court to serve a copy of the complaint on the Defendants.  <u>See</u> Docket No. 6.

The complaint asserts that while participating in a sex offender treatment program, Eagleman refused to provide his group counselor, defendant Steve Larson, with information relating to his juvenile history and asserted his right against self incrimination.  Eagleman contends that as a result, he was expelled from the sexual offender treatment program, threatened with civil commitment, stripped of certain institutional privileges, and suffered other acts of retaliation.  Eagleman also contends that he was wrongfully disciplined in retaliation for filing grievances, taking administrative appeals, and reporting alleged misconduct to higher prison officials.  Eagleman also challenges a disciplinary hearing on October 18, 2004, which resulted in sanctions.  Eagleman asserts the committee refused him the opportunity to call witnesses, cross-examine witnesses, or present documentary evidence on his own behalf.  Eagleman also contends that he was prohibited from engaging in religious activities.  Finally, Eagleman asserts that he was denied access to the penitentiary law library on a number of different dates.

Eagleman and the Defendants have provided the Court with numerous exhibits and affidavits relating to Eagleman's claims.  In an effort to thoroughly address Eagelman's complaints, the Court has set forth evidence relating to each claim separately.

A.    **SEX OFFENDER TREATMENT**

On September 19, 2002, Eagleman pled guilty to a Class A Felony, Gross Sexual Imposition, and a Class A Misdemeanor, Harboring a Runway Minor.  Eagleman was sentenced to five years of imprisonment on the felony charge, which was suspended for four years, and to one year of imprisonment on the misdemeanor charge, which was suspended for two years.  During the suspended period, Eagleman was placed on supervised probation subject to a set of conditions.  See Criminal Judgment and Commitment, Exhibit A-1 (Docket No. 37-3).  Condition number twelve of the Conditions for Sentence to Probation ordered Eagleman to "attend, participate in, cooperate with and successfully complete the following rehabilitative or treatment programs:  sex offender treatment."  See Appendix "A" of the Criminal Judgment and Commitment, Exhibit A-1 (Docket No. 37-3).  Condition 20D also ordered Eagleman to

1.    Actively participate in sex offender treatment, follow all program rules and requirements, and remain in such treatment at the direction of your probation officer.

2.    Authorize your therapist to disclose to your supervising probation officer and/or the Court information about your attendance and progress in treatment.

See Appendix "A" of the Criminal Judgment and Commitment, Exhibit A-1 (Docket No. 37-3).

On October 16, 2002, Eagleman's supervised probation was revoked for violating the conditions of his probation.  See Order Revoking Probation, Exhibit A-2, (Docket No. 37-4). Eagleman was sentenced as follows:

IT IS THE ORDER AND JUDGMENT of this Court that Matthew Eagleman, for the Harboring a Runaway charge, serve one (1) year with the Department of Corrections with credit for 141 days.  For the GSI charge he shall serve five (5) years with the Department of Corrections with no credit for time served.  He is to serve four (4) years consecutive with the Harboring charge.  One (1) year will be suspended for five (5) years upon his release.  His previous Appendix A conditions shall be re-imposed.  The Court recommends placement in sex offender treatment at the Department of Corrections.

3

See Order Revoking Probation, Exhibit A-2, (Docket No. 37-4).

Eagleman contends that he was not ordered to complete sex offender treatment while incarcerated, but rather such treatment was merely recommended.  See Affidavit of Matthew Eagleman, ¶ 3 (Docket No. 57-1).  Eagleman contends that the "Appendix A" condition only applied to his period of supervision after his release and not during his incarceration.  Id. ¶ 4.

On October 1, 2002, state Juvenile Court Judge Donovan Foughty authorized the release of Eagleman's juvenile court records to the DOCR.[1]  See Authorization for Release of Juvenile Court Records, Exhibit B-3 (Docket No. 37-4).   On November 15, 2002, Eagleman signed two Authorization for Release of Information forms:  one for the Southeast Human Service Center in Fargo, North Dakota, and another for Home on the Range in Sentinal Butte, North Dakota.  See Docket No. 57-2.   The releases authorized the treatment department of the Department of Corrections – Prisons Division to both send and receive information relating to his juvenile court records.  Id.

In November of 2002, Eagleman was referred for Sex Offender Education Class.  See Affidavit of Steve Larson, ¶ 3, Exhibit B (Docket No. 37-1).  On March 12, 2003, Eagleman began Sex Offender Education Class.  See Affidavit of Steve Larson, ¶ 3, Exhibit B (Docket No. 37-1). Eagleman completed the Sex Offender Education Class and was referred to the Intensive Sex Offender group in June 2003, in part because Eagleman continued to rationalize his behavior and

---

[1]The release stated:

Pursuant to Policy 402(C), the Juvenile Court Judge hereby authorizes the release and/or inspection of the Juvenile Court record of MATTHEW EAGLEMAN (DOB: [redacted]) as requested by NORTH DAKOTA DEPARTMENT OF CORRECTIONS based on:  The requesting person or agency is conducting pertinent research studies or has a legitimate interest in the proceeding to which the person or agency would not otherwise be permitted. . . . The following information may be released:  ALL INFORMATION RELATIVE TO CHARGES AND DISPOSITION.

See Authorization For Release of Juvenile Court Records, Exhibit B-3 (Docket No. 37-4).

because little was known about his juvenile offenses.   Id.; Progress Notes 11/12/2002, Outcome/Modification, Exhibit B-1 (Docket No. 37-2).

In March of 2004, Eagleman began the Intensive Sex Offender Program. Id. ¶ 5.  According to Steve Larson, Eagleman's counselor, Eagleman was minimally involved in the group sessions and tended to minimize his sexual offending behavior when discussing it in group sessions.   Id. ¶ 5. Larson consulted the court records concerning Eagleman's juvenile convictions.  Affidavit of Steve Larson, ¶ 7, Exhibit B (Docket No. 37-1).  These records revealed information directly contrary to Eagleman's characterizations of his juvenile offenses.  See Findings of Fact, Conclusion of Law and Order of Disposition, Exhibit B-3 (Docket No. 37-4).

Larson then confronted Eagleman regarding the discrepancies in Eagleman's description of his juvenile offenses and the juvenile court records.  See Affidavit of Steve Larson, ¶ 9 (Docket No. 37-1); Progress Notes, 10/11/2004, Individual, Exhibit B-2 (Docket No. 37-3).  Larson advised Eagleman that he would have to share his juvenile history with the group at the next session on October 12, 2004.  Id.  According to Larson, Eagleman did not attend the October 12, 2004, group session.  Id.  Larson spoke with Eagleman after the October 12, 2004, group session and again told Eagleman that he expected him (Eagleman) to share his juvenile history with the group.  Id. ¶ 10. Larson told Eagleman his absence on October 12, 2004, was unexcused, and that Eagleman was expected to attend the next group session on October 14, 2004.  Id.

On October 14, 2004, Eagleman attended the Intensive Sex Offender group session.  Id. ¶ 10; Progress Notes 10/14/2004, ISO, Exhibit B-2 (Docket No. 37-3).  According to Larson,

> Eagleman came to that session, and agreed that I could discuss what we had talked about concerning his failure to reveal his juvenile offenses.  But when I brought up the subject of his having been dishonest about his juvenile offenses, he claimed not to know what I was talking about.  He became quite angry and hostile.  Because he

5

> would not participate honestly in the group session and discuss his offending history,
> I asked him to leave the group.  He refused to leave at first and when I told him I
> would have officers escort him out, he then got up to leave.  At that time, he stood
> over my chair in an extremely threatening posture and said to me, "You'll be sorry."
> I thought at that time he might hit me or attack me in some way.

See Affidavit of Steve Larson, ¶ 10, Exhibit B, (Docket No. 37-1); Progress Notes 10/14/2006, ISO,

Exhibit B-2 (Docket No. 37-3).  Later that day, Larson met with the other clinical staff, and the

clinical staff agreed that Eagleman should be removed from Intensive Sex Offender treatment and

be considered noncompliant with treatment recommendations. Id. ¶ 11; Progress Notes 10/14/2006,

Clinical Staffing, Exhibit B-2 (Docket No. 37-3).

Eagleman describes the incident much differently.  According to Eagleman, Larson

threatened him into divulging his confidential juvenile records and sexual history to members of the

group and to people outside the prison. Eagleman asserts that Larson threatened to remove him from

the sex offender program, take away his privileges, categorize him as a high-risk offender, and

civilly commit him, if he did not admit his juvenile history.  See Complaint (Docket No. 1).

Eagleman contends that he did not know how to answer Larson's questions or did not understand

the questions.  Eagleman denies threatening Larson.  Eagleman asserts that Larson's motives were

not to help rehabilitate Eagleman, but to incriminate him, classify him as a high-risk sex offender

and to civilly commit him.  See Plaintiff's Statement of Material Facts in Dispute, ¶. 17 (Docket No.

59).

On October 14, 2004, Larson also submitted an Incident Report on Eagleman's behavior,

reporting two infractions, an A-45 for failure to comply with rehabilitative programming, and an A-

21 for threat to a staff member.  See Affidavit of Steve Larson, ¶ 12, Exhibit B, (Docket No. 37-1);

Progress Notes 10/14/2006, General, Exhibit B-2 (Docket No. 37-3); Incident Report, Exhibit B-4

(Docket No. 37-5).  On October 16, 2004, Eagleman was found guilty of both infractions.  <u>See</u> Memorandum, Exhibit B-4 (Docket No. 37-6).  As to the A-45 infraction for failure to comply with rehabilitative programming, Eagleman stopped earning good time until he complied with the treatment program, and as to the A-21 infraction for threatening a staff member, Eagleman lost one month of good time and had to serve three days disciplinary detention.  <u>See</u> Incident Report, Exhibit B-4 (Docket No. 37-5).

On October 27, 2004, Eagleman appealed the disciplinary committee action.  <u>See</u> Appeal from Disciplinary Committee Action, Exhibit B-4 (Docket No. 37-6).[2]  On November 5, 2004, Warden Tim Schuetzle denied Eagleman's appeal.  <u>See</u> Memorandum, Exhibit B-4 (Docket No. 37-6).  On November 10, 2004, Eagleman appealed Schuetzle's denial to the DOCR Director.  <u>See</u> Appeal from Disciplinary Committee Action, Exhibit B-4 (Docket No. 37-6).[3]  On December 6, 2004, Director Elaine Little denied Eagleman's appeal.  <u>See</u> Letter from Elaine Little to Matthew Eagleman, dated December 6, 2004, Exhibit B-4, (Docket No. 37-6).

On November 15, 2004, Eagleman requested a copy of the ISO treatment paper he signed.  <u>See</u> Inmate Request dated November 15, 2004, Exhibit A-4 (Docket No. 57-6).  Larson responded that he was unsure of which document Eagleman was referencing and that he was not allowed to release any records to Eagleman.  <u>Id.</u>  Eagleman also filed a grievance against Steve Larson, which

---

[2]The record also contains a letter and appeal from Eagleman to Warden Schuetzle dated November 1, 2004.  In the letter and appeal, Eagleman sets forth his side of the events leading to his removal from sex offender treatment.  <u>See</u> Exhibit A-3 (Docket No. 57-4); Exhibit C-1 (Docket No. 57-16).  It is unclear whether Warden Schuetzle ever received this correspondence or whether it was considered in deciding the outcome of Eagleman's appeal.

[3]The record also includes an appeal to DOCR Director Elaine Little dated November 4, 2004.  <u>See</u> Exhibit A-3 (Docket No. 57-4).  The letter contains the same arguments set forth in the letter to Schuetzle.  Again it is unclear whether Director Little received this appeal and whether it was considered in determining the outcome of Eagleman's appeal.

was denied by Defendant Steve Heidt the same day.  <u>See</u> Inmate Grievance dated November 15, 2004, Exhibit A-5 (Docket No. 57-7).

After being removed from the sex offender treatment program, Eagleman wrote a request to Michael Froemke, Director of Treatment, asserting that Larson was mistreating him.  <u>See</u> Inmate Request, Exhibit A-4 (Docket No. 57-6).   Froemke agreed to meet with Eagleman on November 19, 2004.  <u>Id.</u>  During the meeting, Froemke advised Eagleman that he agreed with Larson's actions and stated he could not give Eagleman his privileges back, nor could he provide Eagleman any other help.  <u>See</u> Memorandum dated November 19, 2004, Exhibit A-5 (Docket No. 57-7).

Eagleman asserts that he has already completed treatment for his juvenile convictions during his five-year placement at Home on the Range.  Eagleman asserts he has been  "exploited, incriminated, and harassed by staff and inmates" and that " inmates and staff have been threatening" him.  He also complains that his "room has been trashed," his "house have been gassed with feces," and his property has been stolen.  Eagleman asserts he has talked to the staff about these problems, but that they failed to do anything.

On August 16, 2005, Heather Lashman of the Treatment Department responded to a request by Eagleman to resume his sex offender treatment.  <u>See</u> Memorandum dated August 16, 2005, Exhibit A-5 (Docket No. 57-7).  Lashman advised Eagleman that he would need to complete a "discovery report" for each of the victims and she included several forms for him to use.  <u>Id.</u>  On September 27, 2005, Lashman advised Eagleman that she had received five discovery reports but that because of the ongoing lawsuit against DOCR she was referring the documents to her supervisor.  <u>See</u> Memorandum dated September 27, 2005, Exhibit A-5 (Docket No. 57-7).

On October 18, 2005, Eagleman filed a grievance requesting to be allowed back into sex offender treatment. See Inmate Grievance dated October 18, 2005, Exhibit A-5 (Docket No. 57-7). On October 28, 2005, Eagleman received the following response:

> The treatment department is looking into the possibility of you returning to treatment. Due to the lawsuit you initiated that hasn't been resolved yet, there are some staff members that have a legal "conflict of interest" which may have an effect on the possibility of you receiving another opportunity for treatment. If you are granted this opportunity, you will be notified when and where it will occur.

Id. On November 2, 2005, Sandy Bender denied Eagleman's request to return to sex offender treatment, citing his continued deception and failure to take responsibility for his offenses as the reasons his request was denied. See Memorandum dated November 2, 2005, Exhibit A-5 (Docket No. 57-7). On November 14, 2005, Eagleman filed a Step 2 Grievance challenging the decision to deny his request to return to sex offender treatment. See Inmate Grievance dated November 14, 2005, Exhibit A-5 (Docket No. 57-7). On December 15, 2005, Eagleman's grievance was denied because Eagleman refused to honestly complete the discovery reports. Id. On December 16, 2005, Eagleman filed another grievance regarding the decision to deny his request to return to sex offender treatment. See Inmate Grievance dated December 16, 2005, Exhibit A-5 (Docket No. 57-7). On December 22, 2005, Director Leann Bertsch denied Eagleman's appeal, noting that he did not have enough time left on his sentence to complete the treatment program. See Letter dated December 22, 2005, Exhibit A-5 (Docket No. 57-7).

On December 25, 2005, Eagleman filed four more grievances regarding his desire to return to sex offender treatment. See Inmate Grievances dated December 25, 2005, Exhibit A-5 (Docket No. 57-7). Eagleman filed another grievance on December 27, 2005, asserting the same. See Inmate Grievance dated December 27, 2005, Exhibit A-5 (Docket No. 57-7).

## B.   FILING GRIEVANCES, TAKING ADMINISTRATIVE APPEALS, AND REPORTING ALLEGED MISCONDUCT TO PRISON OFFICIALS

Eagleman's complaint sets forth several allegations of retaliation, and the attachments to the complaint include numerous grievance forms. <u>See</u> Complaint (Docket No. 3). Eagleman also included several grievance forms as exhibits to his affidavit. <u>See</u> Affidavit of Matthew Eagleman (Docket No. 57-1).

On November 14, 2004, Officer Hintz wrote a Minor Rule Infraction at 8:00 a.m. asserting that Eagleman failed to perform his assigned duty of assisting another inmate, Elvin Lund, to brunch. Hintz noted this was the second consecutive day that Eagleman failed to perform his "ADA job." It does not appear that Eagleman was punished for this infraction. <u>See</u> Minor Rule Infraction dated November 14, 2004, Exhibit A-3 (Docket No. 37-5). On November 15, 2004, Officer Charvat wrote a Minor Rule Infraction asserting that Eagleman had again failed to perform his assigned duties. Eagleman failed to assist Lund to computer class at 1:30 p.m. and to lunch and a blood test at 2:30 p.m.. Apparently, Eagleman eventually assisted Lund, but only after a traffic officer found him in the law library and reminded him. Eagleman lost his pay for that day. <u>See</u> Minor Rule Infraction dated November 15, 2004, Exhibit A-3 (Docket No. 37-5). On November 16, 2004, Officer Voegele wrote a Minor Rule Infraction asserting that Eagleman failed to bring Lund to traffic by 2:30 p.m. Eagleman lost two days worth of pay as punishment. <u>See</u> Minor Rule Infraction dated November 16, 2004, Exhibit A-3 (Docket No. 37-5). On November 17, 2004, Officer Ronsberg wrote a Minor Rule Infraction asserting that Eagleman failed to bring Lund to traffic for his 5:30 a.m. blood sugar check. Eagleman brought Lund to traffic at 5:59 a.m., but the nurse had left because her shift was over. Eagleman lost a day of pay for the infraction. <u>See</u> Minor Rule Infraction dated November 17, 2004, Exhibit A-3 (Docket No. 37-5).

10

Also on November 17, 2004, Officer Ronsberg filed an Incident Report charging Eagleman with an A-44 infraction for refusal to work or repeated failure to perform assigned duties. According to Ronsberg, Eagleman approached her to discuss the Minor Rule Infraction he was given earlier in the day. Eagleman became upset and refused to return Lund back to the South Unit. Officer Ronsberg then arranged for inmate Christopher Darrell to return Lund to the South Unit. The incident resulted in Eagleman losing his job, his eligibility for performance-based sentence reductions being stopped until he was employed, and 60 days of restriction to room. See Incident Report dated November 17, 2004, Exhibit A-3 (Docket No. 37-5).

On November 15, 2004, Eagleman wrote a grievance against Defendant Bob Coad asserting that he denied Eagleman the opportunity to have witnesses at his hearing. See Inmate Grievance dated November 15, 2004, Exhibit C-1 (Docket No. 57-16). Steve Heidt denied the grievance and advised Eagleman to use the appeal process to resolve the issue. Id.

Eagleman asserts that he wrote grievances against Larson on November 15, 2004, and that the grievances were never forwarded to Larson. Eagleman contends that Heidt denied the grievance against Larson.

In the complaint, Eagleman asserts that he wrote a grievance against Warden Schuetzle on November 15, 2004, which he contends was not forwarded to him. Eagleman asserts that Heidt denied the grievance and stated that Eagleman could not file grievances. No evidence was set forth to support this allegation. Also in the complaint, Eagleman asserts that the Incident Reports alleging a failure to work contain discrepancies in the time of day he failed to work and that the Incident Reports constitute double punishment. See Complaint (Docket No. 3).

11

On November 16, 2004, Eagleman filed a grievance against Officer Flint regarding his failure to bring Lund to brunch.  See Inmate Grievance dated November 16, 2004, Exhibit B-3 (Docket No. 57-11).

On November 17, 2004, Eagleman wrote a grievance against Officer Charvat, but it was denied.  See Inmate Grievance dated November 17, 2004, Exhibit B-3 (Docket No. 57-11).  On November 20, 2004, Eagleman also filed a grievance concerning the Incident Report written by Officer Brooke Ronsberg.  See Inmate Grievance dated November 20, 2004, Exhibit B-5 (Docket No. 57-13).  Eagleman asserts that she changed the times of the incident.  Id.  On November 22, 2004, Heidt responded to the grievance by advising Eagleman to file an appeal through the disciplinary process rather than filing a grievance against the officer.  Id.

On November 19, 2004, Eagleman filed a grievance against Marie Voegele complaining that she was mistreating him.  See Inmate Grievance dated November 19, 2004, Exhibit D-1 (Docket No. 57-17).

On November 20, 2004, Eagleman filed another grievance asserting that Schuetzle was allowing his officers to retaliate against Eagleman.  See Inmate Grievance dated November 20, 2004, Exhibit B-5 (Docket No. 57-13).

On November 22, 2004, Eagleman sent an Inmate Request to Jean Sullivan asking to speak to her about a job.  On December 6, 2004, in another Inmate Request, Eagleman renewed his request for a job.

On December 1, 2004, Eagleman appealed the Disciplinary Committee Action regarding the November 17, 2004, Incident Report.  See Letter dated December 1, 2004, Exhibit B-5 (Docket No. 57-13).  In his appeal, Eagleman asserts that staff members had been treating him unfairly because

of the lawsuit he was contemplating.  On December 3, 2004, Warden Schuetzle upheld the decision

of the Disciplinary Committee, but reduced the sanction to 30 days of cell restriction.  See  Appeal

from Disciplinary Committee Action dated December 1, 2004, Exhibit A-3 (Docket No. 37-5).

On December 7, 2004, Eagleman wrote to Schuetzle complaining that his family who came

to visit him were not allowed to see him.  See Note dated December 7, 2004, Exhibit B-5 (Docket

No. 57-13).

On January 1, 2005, an Incident Report charged Eagleman with (1) threatening another

person, (2) disobeying a verbal order, and (3) disorderly conduct. The Incident Report stemmed from

a meeting between Eagleman and Lt. R. Bjelland, in which Bjelland wanted to speak with Eagleman

about alleged tampering with the law library computers and an alleged threat to inmate Gaede.

During the meeting, Eagleman became agitated and eventually had to be removed by force from the

room.  Eagleman was found guilty of disobeying a verbal order and disorderly conduct and lost one

month good time credit, spent 15 days in disciplinary detention, and ordered to pay $10 fine from

spending account for medical examination by a nurse.  See Exhibit A-9 (Docket No. 37-11).

On January 6, 2005, Eagleman filed grievances addressed to Elaine Little and Warden

Schuetzle asserting that staff used unreasonable force in removing him from Lt. Bjelland's office

on January 1, 2005.  See Inmate Grievances dated January 6, 2006, Exhibit B-7 (Docket No. 57-15).

On January 10, 2005, Eagleman filed two grievances accusing Steve Heidt and Bob Coad

of violating his rights in several hearings. See Inmate Grievances dated January 10, 2005, Exhibit

C-1 (Docket No. 57-16).

On January 11 and 14, 2005, Eagleman filed grievances alleging his "remote" was not

working properly and blamed the malfunction on the officers who searched his cell.  See Inmate

Grievances dated January 11 and 14, 2005, Exhibit B-7 (Docket No. 57-15).  On January 12, 2005, the grievances were denied and Warden Schuetzle upheld the denial on January 19, 2005.  Id.

On January 20, 2005, Eagleman filed a grievance asserting that his mail was being withheld. See Inmate Grievance dated January 20, 2005, Exhibit B-7 (Docket No. 57-15).  Mirna Stromme responded that Eagleman had been given all of his mail.  Id.

On February 23, 2005, Eagleman filed a grievance asserting the channel changing buttons on his television were not working and that the staff had damaged it during transportation from the penitentiary to the James River Correctional Center.  See Inmate Grievance dated February 23, 2005, Exhibit B-7 (Docket No. 57-15).  His request was refused on March 7, 2005.  Id.

On February 23, 2005, Eagleman filed a grievance asserting that copies of his legal papers were lost during his move from Bismarck to Jamestown.  See Inmate Grievance dated February 23, 2005, Exhibit D-5 (Docket No. 57-21).

Eagleman contends that because of the retaliation he suffered "more severe depression, anxiety and stress when he was called a liar, foolish person, manipulator, told he was not knowledgeable, harassed, coerced, threatened, intimidated, incriminated, sexually harassed and touched, and retaliated against."  See Response Brief, p. 8 (Docket No. 56-1).  Eagleman also contends he was retaliated against by the failure of prison officials to answer his Inmate Requests and Inmate Grievances.  See Response Brief, p. 11 (Docket No. 56-1).  Eagleman also asserts that he received an excessive amount of overbroad and vague incident reports between October 2004 and January 2005.  See Response Brief, p. 14 (Docket No. 56-1).

Finally, the Defendant provided the affidavit of Tamera J. Schroeder, an Accountant Technician at the North Dakota State Penitentiary, who stated that although she verifies inmate

account balances for purposes of court filings, she does not discuss the inmate's case with the parties. See Affidavit of Tamera J. Schroeder, ¶¶ 3-5, Exhibit B (Docket No. 37-12). Schroeder denies contacting any defendant named in Eagleman's lawsuits to advise them of the action. Id. ¶ 6. Schroeder completed the Certificate of Inmate Account and Assets on November 15, 2004. See Docket No. 1. Eagleman contends that Schroeder knew what the form was for and that he was intending to file a lawsuit. See Response Brief, p. 6 (Docket No. 56-1).

### C.   OCTOBER 18, 2004, DISCIPLINARY HEARING

Eagleman contends that at the October 18, 2004, disciplinary hearing his Due Process rights were violated when the committee refused to call seven of his witnesses and failed to adequately describe the evidence they relied on or the reasons the sanctions were imposed. Eagelman also asserts that he did not receive a copy of the sanction until the last day of his appeal period.

> On 10-18-4, I was at an adjustment committee hearing. The Defendant's, Steve Heidt and Bob Coad were adjustment committee facilitators. The Defendant's, Steve Heidt and Bob Coad, refused to call 7 credible witnesses, they would not permit me to confront or cross-examine the accusers, I was not allowed to have a staff representative and the committee denied the statements.
>
> The statements were not recorded, Steve Heidt and Bob Coad did not give me justifiable cause why I was denied due process, they failed adequately to record the evidence relied on or reasons why sanctions were imposed, and explanation of what the two inmates had indicated in their testimony was not provided in the written report of the adjustment committee hearing and no documents were showing to me at this 10-18-04 hearing.

See Affidavit of Matthew Eagleman, ¶ 11-12 (Docket No. 57-1). Eagleman contends that inmates Bruce Star and Ronald Ernst refused to complete witness forms because they feared retaliation. See Response Brief, p. 16 (Docket No. 56-1). Eagleman asserts that he attempted to submit statements

15

from three other inmates the day before the hearing, but that Defendants Bob Coad and Steve Heidt refused to accept them.  See Response Brief, p. 16 (Docket No. 56-1).

The record reflects that Eagleman asked for two witnesses, Star and Ernst.  See Memorandum to Adjustment Committee dated October 15, 2004, Exhibit B-4 (Docket No. 37-6). According to Capt. Mittlestadt, both witnesses did not want to fill out the witness form that is normally used and gave verbal statements to Mittlestadt instead.  Id.  Mittelstadt determined both inmates confirmed Larson's version of the event and did not provide any assistance to Eagleman. Id.   The Adjustment Committee's findings were based on the Incident Report, Eagleman's admissions, and Eagleman's testimony.  Id.  It does not appear that Eagleman was permitted to cross-examine his accusers, call any witnesses, or present additional evidence.  Id.

On November 15, 2004, Eagleman wrote a grievance to Warden Schuetzle complaining about his disciplinary hearing.  See Inmate Grievance dated November 15, 2004, Exhibit C-1 (Docket No. 57-16).  Schuetzle denied the request and advised Eagleman to use the appeal process. Id.  Eagleman also requested all the evidence the Adjustment Committee used against him.  See Inmate Request dated November 15, 2004, Exhibit C-1 (Docket No. 57-16).  Schuetzle responded that Eagleman could not have access to the confidential information and would need to work with his case manager to access any other evidence.  Id.

On November 17, 2004, Eagleman filed a Step 2 grievance against Warden Schuetzle asserting his procedural rights were violated at the disciplinary hearing.  See Inmate Grievance dated November 17, 2004, Exhibit A-5 (Docket No. 57-7).

Eagleman asserts that he presented additional evidence during the appeal of the Adjustment Committee's decision because he was not allowed to submit it to the committee.  See Affidavit of

16

Matthew Eagleman, ¶ 13 (Docket No. 57-1); Exhibit A-3 (Docket No. 57-4); and Exhibit C-1 (Docket No. 57-16).

### D.       RELIGIOUS ACTIVITIES

According to Warden Schuetzle, Eagleman had been playing music for one of the religious services in November of 2004.  After Eagleman received the Class A Incident Report, the chaplin advised Eagleman that he could not continue to play music for the church service because the chaplin considers this activity to be a privilege similar to using the music room.  See Affidavit of Timothy Schuetzle, ¶ 15, Exhibit A (Docket No. 37-2).  The Inmate Handbook prohibits an inmate from using the music room if he has had a Class A Infraction during the preceding 120 days.  See Inmate Handbook, p. 81, Exhibit A-5 (Docket No. 37-7).  Eagleman did not file a grievance concerning the loss of the privilege of playing music at the church service.  See Affidavit of Timothy Schuetzle, ¶ 15, Exhibit A (Docket No. 37-2).  According to Schuetzle, Eagleman was allowed to attend one religious service or Bible study each week while he was on cell restriction.  See Affidavit of Timothy Schuetzle, ¶ 16, Exhibit A (Docket No. 37-2); Inmate Handbook, p. 22, Exhibit A-5, (Docket No. 37-7).

On November 22, 2005, Eagleman contends he filed several grievances relating to his participation in religious services.  See Inmate Grievances dated November 22, 2004, Exhibit E-1 (Docket No. 57-22).  Eagleman asserted that he has not allowed to go to any religious services or participate in any religious activities.  Id.  Eagleman asserts that Coad, Heidt, Schuetzle, and Little all concurred with the decision.  Id.  On November 22, 2004, Eagleman received confirmation from Chaplin Dave Vaughn that Eagleman could not participate in any religious activities because of the

17

two Class A reports.  <u>See</u> Note dated November 22, 2004, Exhibit E-1 (Docket No. 57-22).  The Defendants assert that Eagleman did not actually file the grievances dated November 22, 2005, because they have no record of receiving them.  <u>See</u> Affidavit of Steve Heit, Exhibit D (Docket No. 66).

### E.        ACCESS TO LAW LIBRARY

In the complaint, Eagleman asserts that on November 22, 2004, Bob Coad denied him access to the law library and that Officer Ron Kopp denied him access to the law library on November 27, 2004.  Neither of these assertions are supported by the evidence in the record.

On November 18, 2004, Eagleman wrote a grievance against Officer Voegele.  Eagleman complained that he was forced to leave the law library to do his job.  The grievance was denied as "ungreivable."  <u>See</u> Inmate Grievance Form dated November 18, 2004, Exhibit A-4 (Docket No. 37-6).

On November 22, 2004, Eagleman requested that Barb Gross confirm a statement she made to him regarding the law library.  <u>See</u> Inmate Request dated November 22, 2004, Exhibit C-1 (Docket No. 57-16).  Gross responded that she did not speak with Eagleman on November 22, 2004. <u>Id.</u>  Also on November 22, 2004, Eagleman sent an Inmate Request to Dan Wrolstad asking him to confirm the policy that an inmate can only leave the law library for bathroom breaks.  <u>See</u> Inmate Request dated November 22, 2004, Exhibit D-1 (Docket No. 57-17).  Wrolstad responded by referring Eagleman to the Inmate Handbook.  <u>Id.</u>

On November 28, 2004, Eagleman filed a grievance asserting that he was being denied access to the law library.  <u>See</u> Inmate Grievance dated November 28, 2004, Exhibit D-1 (Docket No. 57-17).

On November 29, 2004, Eagleman filed a grievance complaining of lack of access to the law library.  <u>See</u> Inmate Grievance dated November 29, 2004, Exhibit D-2 (Docket No. 57-17).   This incident involved Officers Ron Kopp, Barb Bailey, and Lt. Tom Radenz.  <u>Id.</u>  On November 29, 2004, Eagleman sent a request to Cathy Jensen asserting that Barb Gross denied him access to the law library.  <u>See</u> Inmate Request dated November 29, 2004, Exhibit D-2 (Docket No. 57-17).  Eagleman asserted he had two legal cases pending.  <u>Id.</u>

On November 30, 2004, Eagleman filed several grievances asserting that he was denied access to the law library.  <u>See</u> Inmate Grievances dated November 30, 2004, Exhibit D-2 (Docket No. 57-17).  Eagleman names Barb Gross, Barb Bailey and Lt. Tom Radenz as the individuals who denied him access to the law library.  <u>Id.</u>

On November 30 and December 1, 2004, Eagleman requested that Barb Bailey confirm that she denied him access to the law library.  <u>See</u> Inmate Requests dated November 30 and December 1, 2004, Exhibit D-1 (Docket No. 57-17).

On December 2, 2004, Eagleman filed a grievance alleging he had been denied his right to use the law library and that staff members had taken away his religion, his right to exercise, and other rights.  Eagleman asserts that such actions constitute staff retaliation and an attempt to "to try and slow my work down."  Eagleman's grievances included the following allegations:

> My grievances, kites, and questions are being denied by all your staff.  My life has been threatened and you mock me bye saying I have no knowledge of the law.  I have been diagnosed with severe manic depression.  This has caused me to be very depressed, I also am very stressed.  I can not walk these hall of this institution

> without being harassed by a staff member.  This is staff retaliation and you are
> allowing this to happened, you also believe your staff are always right.  You keep me
> isolated from other inmates, I cant make calls, home.  You have denied all my rights.
> Even when I was not on cell-restriction I was denied access to the law library.  I am
> not allowed to make any attorney calls.
>
> The basis of this grievance is to show you have violated my rights, and my life has
> been threatened.  But you don't ever bother to help.
>
> No attempts have been made, because I am being denied my rights.  I've asked for
> help but are being denied.
>
> I am asking to be allowed in the law library.  And be permitted to go eat without the
> staff harassing me.  I should be protected.  It's my right.

See Inmate Grievance dated December 2, 2004, Attachment to Complaint.  (Docket No. 3).  In a

rather lengthy response, Jean Sullivan dismissed the grievance after finding that Eagleman had sent

a notice of appeal on his Ramsey County case and that Eagleman was attempting to circumvent the

rules to access the law library at time not allowed for an inmate on restriction to quarters.  Sullivan

also noted that Warden Schuetzle had reduced the number of days Eagleman was restricted to his

quarters and that on December 27, 2004, Eagleman would no longer be on cell restriction.

On December 8, 2004, Lt. Tom Radenz denied Eagleman's grievances.  In a memorandum,

Lt. Radenz told Eagleman that he was not refused access to the law library but that Eagleman was

allowed access during the morning and afternoon session due to his cell restriction.  Lt. Radnez also

stated that any deviation  from this schedule had to be approved by following the chain of command.

On December 9, 2004, Eagleman wrote an Inmate Request to Dan Wrolstad asking Wrolstad

to confirm a statement made by Barb Bailey.  See Inmate Request dated December 9, 2004, Exhibit

B-5 (Docket No. 57-13).  The same day, Eagleman wrote an Inmate Request to Jean Sullivan asking

her to confirm a statement she made to Eagleman regarding access to the law library.  See Inmate

Request dated December 9, 2004, Exhibit B-5 (Docket No. 57-13).

On December 13, 2004, Warden Schuetzle responded to Eagleman's Step 2 grievance on the use of the Law Library on November 29, 2004, and to two other grievances involving the same matter written on December 9 and 10.  See Inmate Grievance Forms dated December 9 and 10, 2004, Exhibit A-6 (Docket No. 37-8)  Schuetzle affirmed the denial of Eagleman's grievance, stating that Eagleman did not have a legitimate need to be in the law library while on cell restriction because the case he was working on was one he was pursuing himself and it had no imminent deadlines.

On December 15, 2004, Steven T. Heidt, a case manager, wrote a memorandum to Eagleman informing him that he would be allowed access to the law library between the hours of 7:00 a.m. to 10:30 a.m. while on "Restriction to Quarters" on the dates of December 17, 20, 22, and 24, 2004. See Restriction to Quarters Memorandum dated February 20, 2003, Exhibit A-6 (Docket No. 37-8)("The inmate may use the Law Library from 7:00 a.m. to 10:30 a.m. only if there is a pending legal case with time constraints).  Heidt warned Eagleman that he was only allowed to work on his Supreme Court appeal No. 20040359 and his Ramsey County case No. 02-K-474 and that if Eagleman was found to be working on other legal work, he would be written up on a major incident report.

On January 1, 2005, inmate Dennis Gaede filed a report asserting that Eagleman had threatened him and tampered with the computers in the law library.

On February 15, 2005, Eagleman sent a request to Schuetzle asking to stay in Bismarck because he had many papers due in court and needed to continue researching.  See Inmate Request dated February 15, 2005, Exhibit D-4 (Docket No. 57-20).  Schuetzle responded that there was a law library in Jamestown and that his legal papers would be forwarded to him.  Id.

On February 23, 2005, Eagleman filed a grievance asserting that the law library in Jamestown was inadequate.  See Inmate Grievance dated February 23, 2005, Exhibit D-5 (Docket No. 57-21).  Eagleman was told the library at JRCC was deemed by the Attorney General's Office to be sufficient.  Id.  On March 6, 2005, Eagleman filed a Step 2 grievance which was denied.  See Inmate Grievance dated March 6, 2005, Exhibit D-5 (Docket No. 57-21).

Eagleman generally asserts that Steve Heidt, Jean Sullivan, Barb Bailey, Timothy Schuetzle and Barb Gross made up excuses to keep him out of the law library.  He also contends that his absence from the law library is evidenced by the lack of his signature in the "law library law book." See Response Brief, p. 20 (Docket No. 56-1).

## II.   LEGAL DISCUSSION

### A.   SUMMARY JUDGMENT

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000).  A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996).

The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### B.    RETALIATION RE:  FIFTH AMENDMENT RIGHTS

Eagleman claims that he was retaliated against following the invocation of his Fifth Amendment right against self incrimination. Eagleman characterizes his refusal to discuss his juvenile record as an invocation of his Fifth Amendment rights. Eagleman contends that as a result of asserting his right against self incrimination, he was subjected to retaliation in the form of expulsion from sex offender treatment, loss of performance-based sentence reduction (PBSR), and potential future criminal prosecutions, higher risk sex offender status, and civil commitment.

The Defendants assert that Eagleman's Fifth Amendment rights were not implicated in his termination from the sex offender treatment program and that Eagleman's loss of privileges and PBSR did not rise to the level of compulsion for purposes of the Fifth Amendment rights against self-incrimination. The Defendants assert that Eagleman could not have been in fear of conviction

because he had already been adjudicated a delinquent as to the juvenile offenses.  As a result, the Defendants conclude that he faced no real danger of further delinquency adjudications.

The Fifth Amendment to the United States Constitution provides in part that "[n]o person . . . shall be compelled, in any criminal case, to be a witness against himself."  U.S. Const. amend. V.  The Fifth Amendment privilege against self-incrimination protects against real dangers, not remote and speculative possibilities that the testimony may be used to secure a conviction.  United States v. Mahasin, 363 F.3d 1071, 1085 (8th Cir. 2004).  Additionally, the Fifth Amendment privilege against self incrimination does not apply to offenses for which a individual has already been found guilty.  Phelps v. U.S. Federal Gov't, 15 F.3d 735, 739 (8th Cir. 1994).

It is well-established that a state may not impose substantial penalties on a person who decides to invoke his right against self-incrimination.  See Doe v. Sauer, 186 F.3d 903, 906 (8th Cir. 1999) (citing Minnesota v. Murphy, 465 U.S. 420, 434 (1984)).  "Notwithstanding the prohibition on the state of penalizing a person who invokes his Fifth Amendment right, 'prison officials may constitutionally deny benefits to a prisoner who, by invoking his privilege against self-incrimination, refuses to make statements necessary for his rehabilitation, as long as their denial is based on the prisoner's refusal to participate in his rehabilitation and not his invocation of his privilege.'"  Doe v. Sauer, 186 F.3d 903, 906 (8th Cir. 1999)(quoting McMorrow v. Little, 109 F.3d 432, 436 (8th Cir. 1997)).

The United States Supreme Court recently ruled in a case in which an inmate asserted that a sexual abuse treatment program and corresponding regulations and policies violated his Fifth Amendment right against self-incrimination.  See McKune v. Lile, 536 U.S. 24 (2002).  The Supreme Court held that:

24

> a prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces from not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.

McKune v. Lile, 536 U.S. 24, 37-38 (2002).  The Supreme Court also noted that:

> [An inmate's] choice is marked less by compulsion than by choices the Court has held give no rise to a self-incrimination claim.  The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow.  Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. It is well settled that the government need not make the exercise of the Fifth Amendment privilege cost free.

Id. at 41 (citation and internal quotation marks omitted).

For Eagleman's Fifth Amendment rights to be implicated, Eagleman must have been in real danger that his testimony would be used to secure a conviction.  It is undisputed that Eagleman was asked to disclose his juvenile offenses during group therapy – offenses for which he had already been adjudicated a delinquent.  It is clear that such a circumstance does not implicate an inmate's Fifth Amendment rights.  See Phelps v. U.S. Federal Gov't, 15 F.3d 735, 739 (8th Cir. 1994) (Fifth Amendment privilege against self incrimination does not apply to offenses for which a individual has already been found guilty).  Neither Eagleman nor the Defendants assert that Eagleman was asked to disclose conduct other than that for which he was already adjudicated a delinquent or had pled guilty.  The Court finds that Eagleman's Fifth Amendment rights were not implicated.  Eagleman could not have reasonably feared that the disclosure of his juvenile offenses would result in additional criminal prosecutions.

However, even if the Court were to conclude that Eagleman had properly asserted his Fifth Amendment rights and refused to disclose his juvenile offenses, Eagleman's claims of retaliation

would fail.  In other words, there is simply no evidence that the Defendants' action were retaliatory.

Eagleman contends that once he refused to disclose his juvenile record, the Defendants retaliated

against him by expelling him from sex offender treatment, taking away his ability to earn

performance-based sentence reduction (PBSR),  and exposing him to future criminal prosecutions,

higher risk sex offender status, and civil commitment.  Eagleman has not offered any evidence

sufficient to create a genuine issue of material fact on these issues.  All of the evidence leads to the

conclusion that the Defendants acted in accordance with established statutes and policies when they

expelled Eagleman from sex offender treatment and took away his ability to earn performance-based

sentence reductions.

It is clear that "prison officials may constitutionally deny benefits to a prisoner who, by

invoking his privilege against self-incrimination, refuses to make statements necessary for his

rehabilitation, as long as their denial is based on the prisoner's refusal to participate in his

rehabilitation and not his invocation of his privilege."  See  Doe v. Sauer, 186 F.3d 903, 906 (8th

Cir. 1999).  As to Eagleman's claim that he was expelled from sex offender treatment, the record

clearly establishes that Eagleman was terminated from the sex offender program for refusal to

acknowledge his juvenile record – an action which the treatment staff deemed necessary for his

rehabilitation.  See Affidavit of Steve Larson, ¶ 10, Exhibit B (Docket No. 37-1); Progress Notes

10/14/2006, Clinical Staffing, Exhibit B-2 (Docket No. 37-3).[4]  It is also clear that once he refused

to fully participate in the sex offender program, Eagleman was no longer eligible for PBSR.  North

Dakota statute sets forth the mechanism for performance-based sentence reduction:

---

[4]Eagleman also contends that the treatment staff at the penitentiary "illegally" obtained his juvenile court records.  The evidence clearly establishes that a state district court judge authorized the release of Eagleman's juvenile records to the North Dakota Department of Corrections, prior to Eagleman beginning Sex Offender Education Classes.

> [O]ffenders committed to the legal and physical custody of the department of corrections and rehabilitation are eligible to earn sentences reductions based upon performance criteria established through department and penitentiary rules. <u>Performance criteria includes participation in court-ordered or staff-recommended treatment</u> and education programs and good work performance. . . .

N.D.C.C. § 21-54.1-01.[5] Once Eagleman made the choice to decline to participate in treatment, he made himself ineligible to receive performance-based sentence reductions. Finally, as to Eagleman's assertions that the Defendants' allegedly retaliatory actions exposed him to future criminal prosecutions, higher risk sex offender status, and civil commitment, Eagleman has failed to set forth evidence to support these assertions.[6]

The Court finds that even if Eagleman had properly asserted his Fifth Amendment rights and refused to disclose his juvenile offenses, the Defendants' decisions to exclude Eagleman from sex offender treatment and to take away his ability to earn performance-based sentence reductions were a direct result of Eagleman's refusal to participate in treatment and these decisions were not based on Eagleman's invocation of his Fifth Amendment rights.[7] As a result, the Court finds that Eagleman has failed to set forth a genuine issue of material fact as to his claim of retaliation for invoking his Fifth Amendment rights, and the Defendants are entitled to summary judgment as a matter of law as to this claim.

---

[5]Eagleman places great emphasis on the fact that he was not court-ordered to participate in sex offender treatment while incarcerated. It is not necessary to resolve this matter. Regardless of whether Eagleman's treatment was court-ordered or staff-recommended, North Dakota law clearly conditions eligibility for performance-based sentence reductions on an inmate participation in treatment regardless of whether it is court-order or staff-recommended.

[6]Throughout his pleadings, Eagleman claims that he wants to resume his sex offender treatment. However, Eagleman consistently conditions his participation upon being treated for only his "adult crimes." Eagleman believes that because he completed sex offender treatment as a juvenile, he does not need to discuss these actions again.

[7]Neither Eagleman nor the Defendants assert that the disciplinary action for threatening a staff member (Steve Larson) contributed to Eagleman's dismissal from sex offender treatment.

C.      RETALIATION  FOR  LAWSUITS,  GRIEVANCES,  ADMINISTRATIVE
        APPEALS, AND REPORTS OF ALLEGED MISCONDUCT

Eagleman alleges that he was retaliated against for bringing this action and for filing grievances, administrative appeals, and reports of alleged misconduct.  The Defendants assert that Eagleman's retaliation claims must fail for two reasons:  (1) the individuals Eagleman identifies as being involved in the retaliatory conduct are not named defendants to this suit, and (2) Eagleman is unable to prove that the actions were taken for retaliatory purposes.

Eagleman sets forth a litany of grievances, requests, and appeals he has filed alleging retaliation and misconduct on behalf of the staff of the Department of Corrections, including named Defendants Steve Larson, Bob Coad, Steve Heidt, Timothy Schuetzle, and Elaine Little.  Eagleman also attributes retaliatory conduct to a host of individuals who are not parties to this lawsuit.[8] Several of the incidents Eagleman references appear to be complaints about the conduct of staff and do not specifically reference any retaliatory conduct taken by staff.  The Court finds that the complaints and requests initiated by Eagleman cannot be considered retaliatory action taken by staff, and thus, such complaints fail to state a claim for which relief can be granted.  As to the actions taken by staff members and reviewed by named defendants,[9] the Court will examine each of these

_____

[8]Eagleman references actions taken by Tamera Schroeder, Officer Hintz, Officer Charvat, Officer Voegele, Officer Rosberg, Officer Flint, Jean Sullivan, Barb Gross, Dan Wrolstad, Lt. R. Bjelland, and Mirna Stromme.

[9]It is somewhat unclear from the pleadings whether Eagleman is alleging that the retaliatory actions he complains of are based on the named Defendants' actions in upholding, concurring, or approving particular disciplinary actions or are  based on the actions taken by those individuals filing the incident reports or rule infractions.  The Court is aware that vicarious liability cannot attach under 42 U.S.C. § 1983.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).  However, Eagleman's complaint, if read liberally, contends that the named Defendants either upheld, concurred, and approved (i.e., participated in) the allegedly retaliatory actions or that the named Defendants failed to take corrective action when Eagleman complained of the alleged retaliation.  In such circumstances, a supervisor may be liable for violation of a federally protected right.  See Ottmann v. City of Independence, 341 F.3d 751, 761 (8th Cir. 2003); Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997).  Thus, the Court will evaluate whether such actions were taken for retaliatory purposes.

instances which resulted in sanctions being imposed against Eagleman to determine whether such conduct constituted retaliation.[10]

During a period beginning in November 2004 and continuing until January 2005, Eagleman was sanctioned as follows:  on November 15, 2004, Eagleman lost a day of pay for failing to perform his assigned duties; on November 16, 2004, Eagleman lost two days worth of pay for failing to perform his assigned duties; on November 17, 2004, Eagleman lost a day of pay for failing to perform his assigned duties; also on November 17, 2004, Eagleman lost his job, stopped earning PBSR and received 60 days of cell restriction for his repeated failure to perform assigned duties (on December 3, 2004, this sanction was reduced to 30 days of cell restriction); and finally, on January 1, 2005, Eagleman lost one month good time credit, spent 15 days in disciplinary detention, and was ordered to pay a $10 fine for disobeying a verbal order and disorderly conduct.  See Minor Rule Infractions dated November 15, 16, and 17, 2004; Incident Report dated November 17, 2004; Appeal from Disciplinary Committee Action dated December 1, 2004, Exhibit A-3 (Docket No. 37-5); Exhibit A-9 (Docket No. 37-11).

The Eighth Circuit has long recognized an inmate's cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for the inmate's exercise of his constitutional rights.  Moore v. Plaster, 266 F.3d 928, 931 (8th Cir. 2001). Claims of retaliation will fail if the alleged retaliatory conduct violations were issued for the actual violation of prison rules.  Id.; Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994).  To prevail on a retaliation claim, an inmate has the heavy burden of showing that the prison officials who disciplined him had an impermissible motive for doing so, and that but for this impermissible

---

[10]Neither Eagleman nor the Defendants characterize the October 14, 2004, Incident Report for threatening a staff member as retaliation.

motive, the disciplinary charges would not have been brought.  Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993).  A defendant may successfully defend a retaliation claim by showing "some evidence" that the inmate actually committed a rule violation.   Moore v. Plaster, 266 F.3d 928, 931 (8th Cir. 2001); Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1992).

The disciplinary actions in November 2004 stem from a three-day period during which three minor rule infractions and one incident report were filed accusing Eagleman of failing to perform assigned duties.  Eagleman was assigned the duty of assisting a disabled inmate, Elvin Lund.  Each of the minor rule infractions for failing to perform assigned duties resulted from personal observations by three different corrections officers that Eagleman failed to escort Lund to brunch, computer class, lunch, and blood tests.  See Minor Rule Infractions dated November 15, 16, and 17, 2004.[11]  The only evidence in the record as to each of these events is the undisputed, first-hand account of each of the correction officers.  Such evidence is sufficient fulfill the "some evidence" requirement.  Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994)(prison officer's undisputed first-hand account of inmate's misconduct was "some evidence" of a violation).   As a result, Eagleman's claims of retaliation stemming from the November 2004 minor rule infractions must fail as a matter of law.

The November 2004 incident report is also supported by "some evidence."  The incident report is supported by the undisputed, first-hand observations of Officer Ronsberg, the testimony of inmate Christopher Darrell, a disciplinary report investigation filed by a Lieutenant whose signature is illegible, and in his appeal from the disciplinary committee's action, Eagleman's own admission that on November 17, 2004, he did not bring Lund back to his cell.  See Incident Report

---

[11]Officer Hintz also wrote a minor rule infraction on November 14, 2004, against Eagleman on November 14, 2004.  However, Eagleman was not punished for this infraction.

dated November 17, 2004, Exhibit A-3 (Docket No. 37-5).  Eagleman claims a mix-up in his schedule was the reason he did not bring Lund to his appointments on time.  Id.  It is undisputed that the other inmate, Christopher Darrell, returned Lund to his cell.  Id.  The Court finds that the Defendants have established "some evidence" supporting the conclusion that Eagleman committed a rule violation, and thus, Eagleman's claim of retaliation as to the November 17, 2004, incident report must fail as a matter of law.

The remaining claims of disciplinary retaliation stem from the January 1, 2005, incident report.  Eagleman lost one month good time credit, spent 15 days in disciplinary detention, and was ordered to pay a $10 fine for disobeying a verbal order and disorderly conduct.  See Incident Report dated January 1, 2005, Exhibit A-9 (Docket No. 37-11).  Again, the Defendants have demonstrated that this disciplinary action is supported by "some evidence."  The incident report includes first-hand observations of Lieutenant Bjelland, a Use of Force Report by Officer Patrick Ross, and Memorandums from Officers Brian Jacobson and J. Peterson.  It is undisputed that Eagleman became agitated during a meeting with Lt. Bjelland in his office regarding alleged tampering with the law library computer and that Eagleman had to be removed by force from the room.  Id.  The Court finds the Defendants have established "some evidence" supporting the conclusion that Eagleman committed a rule violation, and thus, Eagleman's claim of retaliation as to the January 1, 2005, incident report must fail as a matter of law.

D.     **DUE PROCESS RE: OCTOBER 18, 2004, DISCIPLINARY HEARING**

Eagleman claims that he was denied due process in connection with the disciplinary hearing before the penitentiary's Adjustment Committee on October 18, 2004.  The Defendants assert that Eagleman received all of the process he was due during the disciplinary hearing.

The Eighth Circuit has clearly set forth the Due Process rights of inmates when the inmate is deprived of privileges as punishment for past misconduct.

> These due process requirements . . . include (1) written notice of the charges, at least twenty-four hours before the hearing, in order to inform the inmate of the charges and to allow him to prepare a defense; (2) a written statement by the fact finders as to the evidence relied on and the reasons for the disciplinary action; (3) the right of the inmate to be present, to call witnesses, and to present documentary evidence, unless to do so would be unduly hazardous to institutional safety or correctional goals; and (4) in limited situations, a counsel substitute.

Brown-El v. Delo, 969 F.2d 644, 647 (8th Cir. 1992); see also Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974).  "Although inmates retain the right to a hearing for deprivations of certain protected liberty interests after incarceration, the nature of the prison system dictates that inmate are not entitled to the full panoply of rights due a defendant in criminal proceedings."  Hrbek v. Nix, 12 F.3d 777, 780 (8th Cir. 1993) (citing Wolff v. McConnell, 418 U.S. 539-555-56 (1974)).  An inmate has no constitutional right to confront or cross-examine witnesses in a prison disciplinary proceeding.  Id.  In regard to calling witnesses, prison officials have great discretion and may limit an inmate's right to call witnesses.  Espinoza v. Peterson, 283 F.3d 949, 952 (8th Cir. 2002).

Eagleman contends that (1) he was not allowed to call seven witnesses, (2) he was not permitted to confront or cross-examine his accusers, and (3) he was not allowed to have a staff representative present.  As to Eagleman's contention that he requested to call seven witnesses and that he was denied a staff representative, the record clearly reflects that Eagleman requested two

witnesses, Bruce Star and Ronald Ernst, and that Eagleman was represented by Steve Bement. <u>See</u> Incident Report dated October 14, 2004, Adjustment Committee Section, Exhibit B-4 (Docket No. 37-5). Eagleman has failed to produce evidence to contradict the Incident Report. Thus, the Court finds that any claim based on the failure to allow Eagleman to call seven witnesses or to be represented by a staff member is not supported by the evidence. As to Eagleman's claim that he was not permitted to confront or cross-examine his accusers, it is well-established that an inmate does not have the right to confront and cross-examine witnesses during a prison disciplinary hearing. <u>Wolff v. McConnell</u>, 418 U.S. 539-555-56 (1974). The Court finds that Eagleman has failed to set forth a genuine issue of material fact as to his due process claims and that such claims fail as a matter of law.

### E.    <u>EXERCISE OF RELIGIOUS BELIEFS</u>

Eagleman also claims that the Defendants denied his right to the exercise of his religious beliefs. The Defendants asserts that Eagleman has failed to exhaust his administrative remedies. The Defendants also contends that Eagleman never filed the grievances he references in his response brief.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), provides that "no action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." The Supreme Court has interpreted this section to apply to "all inmates suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002). The exhaustion requirement is mandatory, applies even when a prisoner seeks relief not

available in grievance proceedings, and requires that all "available" remedies be exhausted. Id. at 524. Further, the requirement that all "available" remedies be exhausted requires that the prison grievance procedure be completed prior to the filing of any Section 1983 claim. Johnson v. Jones, 340 F.3d 624, 627-28 (8th Cir. 2003); see also Wright v. Morris, 111 F.3d 414, 417 n.3 (6th Cir. 1997).

The Eighth Circuit has recently held that an inmate "who files a complaint in federal court asserting multiple claims against multiple prison officials based on multiple prison grievances must have exhausted each claim against each defendant in at least one of the grievances." Abudal-Muhammad v. Kempker, No. 05-1872 (June 13, 2006, 8th Cir.). The Eighth Circuit further affirmed that an inmate must exhaust all available grievance remedies as to all of the claims prior to filing suit in federal court. Id. (emphasis added).

Despite the dispute between the parties regarding whether the November 22, 2004, grievances were properly filed, the record is devoid of any evidence that Eagleman pursued his grievances through the administrative appeal system. In other words, taking the facts in the light most favorable to Eagleman, the proper filing of the Step 1 grievances does not constitute an exhaustion of all available grievance remedies. There is no evidence that Eagleman pursued the alleged denial of the November 22, 2004, grievances. Eagleman made no attempt to appeal the denial of the November 22, 2004, grievances, nor did he file any additional grievances complaining of the alleged summary denial of the November 22, 2004, grievances. The Court finds that as a matter of law, Eagleman has not exhausted all available administrative remedies as to his November 22, 2004, grievances asserting a denial of his rights to the free exercise of his religious beliefs. As

34

a result, Eagleman has failed to set forth a genuine issue of material fact as to this claim so as to preclude the entry of summary judgment.

### F.      ACCESS TO THE LAW LIBRARY

Finally, Eagleman claims that the Defendants retaliated against him by denying him access to the law library on several occasions and eventually transferred him to an institution with an insufficient law library.  The Defendants assert that Eagleman has also failed to exhaust his administrative remedies as to these claims of denied access to the law library.

As noted above, an inmate must exhaust all available grievance remedies prior to filing suit in federal court.  Abudal-Muhammad v. Kempker, No. 05-1872 (June 13, 2006, 8th Cir.); Johnson v. Jones, 340 F.3d 624, 627-28 (8th Cir. 2003); see also Wright v. Morris, 111 F.3d 414, 417 n.3 (6th Cir. 1997).  Although Eagleman filed numerous grievances regarding his access to the law library at two different institution, it appears he took only two of these grievances to "Step 2" and failed to exhaust his administrative remedies as to any of these grievances.  It is clear that Eagelman did not appeal to the Director of the Department of Corrections.  As a result, the Court finds that as a matter of law, Eagleman has not exhausted all available administrative remedies as to his claims of denied access to the law library.  The Court finds Eagleman has failed to set forth a genuine issue of material fact as to this claim so as to preclude the entry of summary judgment.

### IV.    CONCLUSION

As to Eagleman's claims that his Fifth Amendment right were violated, the Court finds that it is clear that Eagleman's Fifth Amendment rights were not implicated because he could not have

reasonably feared that the disclosure of his juvenile offenses would result in additional criminal prosecutions. Further, even if Eagleman had properly asserted his Fifth Amendment rights and refused to disclose his juvenile offenses, the Defendants' decisions to exclude Eagleman from sex offender treatment and to take away his ability to earn performance-based sentence reductions were a direct result of Eagleman's refusal to participate in treatment and these decisions were not based on Eagleman's invocation of his Fifth Amendment rights. As to Eagleman's claims that the Defendants retaliated against him for bringing this action and for having filed prior grievances, administrative appeals, and reports of alleged misconduct, the Court finds that the disciplinary actions taken by the Defendants were supported by some evidence. As to Eagleman's claim that he was denied due process in conjunction with the October 18, 2004, disciplinary hearing, the Court finds that his claim based on the failure to allow him to call seven witnesses or to be represented by a staff member is not supported by the evidence and that Eagleman does not have a constitutional right to confront and cross-examine witnesses during a prison disciplinary hearing. Finally, the Court finds that Eagleman has failed to exhaust his administrative remedies at to Eagleman's claims of denial of a right to the free exercise of religious beliefs and denial of access to the prison law library.

As a result, the Court expressly finds that Eagleman has failed to set forth a genuine issue of material fact as to any of his claims and that the Defendants are entitled to summary judgment as a matter of law. For the reasons outlined above, the Court **GRANTS** the Defendants' Motion for

Summary Judgment.  (Docket No. 35).  The Court **DENIES** as moot the Defendants' Motion to

Continue Trial.  (Docket No. 67).

**IT IS SO ORDERED.**

Dated this 27th day of June 2006.

/s/  Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court